IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 8, 2025 Session

## STATE OF TENNESSEE v. MICHAEL MALIK TASHAW BROWN

**Appeal from the Circuit Court for Madison County**
**No. 23-665   Joseph T. Howell, Judge**

_____

**No. W2024-01354-CCA-R3-CD**
_____

The Defendant, Michael Malik Tashaw Brown, was convicted by a Madison County Circuit Court jury of filing a false police report, possession of marijuana, and leaving the scene of an accident. On appeal, he argues that the trial court erred in admitting irrelevant and prejudicial evidence about a shotgun found in his vehicle, and that the State failed to establish that he possessed illegal marijuana rather than legal hemp. Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

Joshua L. Lehde, Public Defender Fellow-Appellate Division, Franklin, Tennessee (on appeal), and Tyler Graham and Parker Dixon, Assistant Public Defenders, Jackson, Tennessee (at trial), for the appellant, Michael Malik Tashaw Brown.

Jonathan Skrmetti, Attorney General and Reporter; J. Katie Neff and Ronald L. Coleman, Assistant Attorneys General; Jody Pickens, District Attorney General; and Tyler Ford Buckley, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

At approximately 10:00 p.m. on June 29, 2022, Jackson Police Department ("JPD") Officer Daniel Calderon responded to a report of a downed telephone pole and power lines at the intersection of Wallace Road and Cambrian Way. As Officer Calderon was talking to the driver of a vehicle that had run into the power lines, the Defendant walked up and

informed Officer Calderon that his truck had just been stolen from his in-law's home, and that it was probably the truck that caused the damage. The Defendant had red, glassy eyes, was sweating, smelled of alcohol, and had grass on his clothing. In the meantime, another JPD officer had found the Defendant's wrecked F-150 pickup truck at a nearby church. The Defendant's truck had heavy front-end damage, was dragging telephone pole support cables, and was inoperable. The Defendant's wallet with his identification was on the ground nearby, and inside the truck was an unopened bottle of liquor, a homemade plastic bag of green leafy substance, an AR-style shotgun, and ammunition. Officers arrested the Defendant for DUI, and the Madison County Grand Jury subsequently indicted the Defendant for DUI, filing a false report, simple possession of marijuana, leaving the scene of an accident, and violation of the financial responsibility law.

At the Defendant's March 28, 2024 trial, Officer Calderon testified that he was at Ridgecrest and Henderson when he received the call about the downed power lines. He arrived at the scene to find a broken telephone pole lying halfway across the street, electrical power lines on the ground, a vehicle that had run across the downed power lines, and "the lights in the area all shut off." Officer Calderon identified his dash and body camera video recordings, which were admitted as a collective exhibit and published to the jury during his testimony.

Officer Calderon testified that he learned that the vehicle that had crashed into the telephone pole was on Wiley Parker Road next to Rehoboth Baptist Church. He said that location was not visible from the scene of the downed power lines. Officer Calderon stated that as he was talking to the driver of the vehicle that had run over the downed power lines, the Defendant walked up, identified himself, told him that his truck had just been stolen, and said that it was probably his truck that caused the damage.

Officer Calderon's body camera video recording reveals that the Defendant said to Officer Calderon that he did not know what had happened, but he knew his truck was stolen and that his truck had "more than likely" caused the damage. During the Defendant's conversation with Officer Calderon, the officer was receiving radio communications from other officers about the Defendant's wrecked truck and the AR-style shotgun found inside it. The Defendant volunteered to Officer Calderon that he "r[o]de with firearms" because he was legally permitted to carry and identified the weapon as his 12-gauge AR-15 style shotgun. The Defendant also suggested that the shotgun may have been the reason his truck was stolen.

Officer Calderon testified that the Defendant was sweating, had "glossy, red eyes," smelled of alcohol, and had grass on his clothing. Officer Calderon asked the Defendant for his identification, and the Defendant told him that his wallet had been in his truck when it was stolen. The Defendant also told Officer Calderon that he had left the keys inside and

the engine running as he dropped off his daughter at his in-law's home on Ridgecrest. Officer Calderon testified that he had driven down Ridgecrest as he responded to the scene and did not see anyone who looked like the Defendant walking down the street. He agreed that Ridgecrest was "far . . . away" from the downed power lines.

Officer Calderon testified that after the Defendant was placed in handcuffs, the Defendant told a woman at the scene, whom Officer Calderon believed to be the Defendant's girlfriend, not to talk to the police. Officer Calderon stated that the Defendant's girlfriend and mother-in-law were cooperative with the investigation "[a]t the time[.]" However, neither woman gave a formal written statement to the police. Officer Calderon testified that the Defendant told him that he had been drinking at home that night. He stated that the Defendant appeared to him to be under the influence of an intoxicant and opined that the Defendant was not in a condition to safely operate a motor vehicle.

On cross-examination, Officer Calderon acknowledged that the Defendant was not stumbling or falling and appeared to be talking normally. He said that the downed telephone pole and power lines were not within sight of the Defendant's wrecked truck but acknowledged that the two locations were "in close proximity" to each other. He also acknowledged that he could have missed seeing the Defendant walking down Ridgecrest.

On redirect examination, Officer Calderon testified that the Defendant approached from his left side, which was before the location of the downed power lines and the location of the Defendant's wrecked truck.

JPD Sergeant Julie Mullikin, who responded to both scenes, testified that the Defendant's wrecked truck was next to the church, while the downed power lines were on the opposite side of the church out of view. She stated that there were several indicators that the Defendant was the possible driver: an odor of alcohol was emanating from his person, he was "sweating pretty good" despite it not being a particularly warm night, and he had grass on his clothing. She recalled that at one point during her conversation with the Defendant she asked if he had the keys because the keys were missing from the truck. She said she asked to pat the Defendant down because she wanted to check for the truck's keys. The Defendant "immediately became combative, pulling away, and there was no more cooperation." Sergeant Mullikin testified that the Defendant appeared to be under the influence of an intoxicant and opined that he was not in a condition to safely operate a motor vehicle.

When asked on cross-examination whether it was possible that the dirt and grass on the Defendant's clothing came from his playing with his dog earlier in the day, as the Defendant could be heard explaining in the body camera video recording, Sergeant Mullikin responded that "[t]he grass goes along with the path . . . from the pickup truck."

On redirect examination, she testified that one could walk from the church to the downed power lines by going behind the church, across Cambrian Way, and around another residence, and that that "[was] exactly where [the Defendant] had approached Officer Calderon."

JPD Officer Jacob Raymond McDowell testified that he was responding to the scene of the downed telephone pole when he encountered the Defendant's truck on Wiley Parker. He recalled that the truck had heavy front-end damage, was dragging support cables for a telephone pole, and had a road sign underneath the front right tire. Inside the truck was a shotgun in the driver's door panel, "a bunch of ammunition[,]" what appeared to be a "homemade" plastic bag of suspected marijuana in the center console, and an unopened bottle of "Raspberry Bootlegger's liquor" on the driver's floorboard. Officer McDowell did not recall seeing the truck's keys.

On cross-examination, Officer McDowell acknowledged it was possible that someone stole the truck and then abandoned it, leaving the drugs and shotgun behind. On redirect examination, he testified that, based on his experience, car thieves usually leave the vehicle's keys behind when they abandon a stolen vehicle.

JPD Officer Nathaniel Robert Howard testified that he found in the parking lot of the Rehoboth Baptist Church the Defendant's wallet with the Defendant's identification inside.

Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist Carter DePew, an expert in forensic chemistry, testified that she presumptively identified the plant material submitted for analysis as marijuana by performing "two different chemical color change tests as well as a microscopic examination and a macroscopic examination." On cross-examination, she testified that she could "[n]ot conclusively" confirm that the substance she tested was marijuana.

On redirect examination, Agent DePew testified that the TBI performed two different color change tests for suspected marijuana: the Duquenois-Levine test "to determine if cannabinoids are present"; and "the 4-AP, or 4-aminophenol test, which determines if the ratio of CBD or THC is higher in the plant material." She explained that the reaction would turn blue if the THC level was higher than the CBD level, indicating presumptive marijuana. If the CBD level was higher than the THC level, the reaction would turn pink, indicating presumptive hemp. In this case, "[t]he THC ratio was higher than that of the CBD, giving a blue reaction, indicating presumptive marijuana." She "c[ould] not give a numerical value on the accuracy of the test, but [she] ha[d] not had personal experience with any conflicting results of the test."

On recross-examination, she testified that she could not testify "within any certainty that it is for sure marijuana. Just presumptively."

At the conclusion of the State's proof, the trial court granted the Defendant's motion for judgment of acquittal on the violation of the financial responsibility law count of the indictment. The Defendant rested his case without presenting any proof, and after deliberations, the jury acquitted him of DUI and convicted him of filing a false police report, possession of marijuana, and leaving the scene of an accident.

## ANALYSIS

### I. Evidence Relating to Shotgun

The Defendant contends that the trial court erred in allowing officers to testify about his shotgun, arguing that it was irrelevant to any of the charges against him and created a substantial risk of unfair prejudice because it "painted a negative picture of [him] in an otherwise close case." The Defendant asserts that testimony that he had a shotgun and ammunition within ready reach in his vehicle "prejudicially implied that [he] was a violent person[,]" "portrayed him as the kind of person who would lie to police[,]" and "likely" led the jury to believe that he was a bad person.

The State argues that the trial court acted within its discretion in allowing the testimony because evidence of the shotgun was probative of the Defendant's deceitfulness to officers, bolstered the State's theory that the truck was not stolen and that it was the Defendant who drove the truck into the telephone pole, linked the Defendant with the truck, and "provided necessary context for the discussion about the discovery of the truck as the two conservations occurred simultaneously." The State notes that the jury was able to see the Defendant's facial expression, response, and demeanor on the body camera video recording at the moment that officers confronted him with the discovery of the wrecked truck and shotgun and argues that "[w]ithout the firearms evidence, the video would have to be edited in a way that would strip the conversation of important context." The State further argues that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice as "the Defendant fails to explain how his lawful possession of a firearm implies that he is a violent person."

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). An abuse of discretion occurs "when the court applied an incorrect legal standard, reached an illogical conclusion, or based its decision on a clearly erroneous assessment of the evidence or

employs reasoning that causes an injustice to the party complaining." *State v. Davidson*, 509 S.W.3d 156, 207 (Tenn. 2016) (citation omitted).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The Defendant first raised an objection to the shotgun evidence during Officer Calderon's testimony as Officer Calderon explained portions of his body camera video recording. The prosecutor asked Officer Calderon if the Defendant gave him any detail on what could possibly be in his truck, and the Defendant objected, arguing that any mention of the shotgun would have a prejudicial effect on his case. The prosecutor then informed the trial court that "later down in the video you will hear [the Defendant] saying that a possible reason the truck was stolen was because of the shotgun." The trial court noted the Defendant's objection but allowed the testimony. The Defendant renewed his objection at the start of Officer McDowell's testimony, and the trial court again noted the objection but allowed the testimony.

We agree with the State that the trial court acted within its discretion in admitting the evidence. As the State points out, Officer Calderon's conversation with the Defendant occurred simultaneously with his conversations with other officers over the radio about the wrecked truck and the shotgun found inside it. The body camera video recording reflects that the Defendant overheard those radio communications and, unprompted, identified both the truck and shotgun as his, provided a description of each, and suggested that the presence of the shotgun was what motivated the theft of the truck. Evidence that the shotgun was in the truck after the alleged theft of the truck was relevant and probative to help the State counter the Defendant's suggestion that someone stole his truck to obtain the shotgun and to show that the Defendant lied to the officers about the theft. Moreover, evidence of the Defendant's legal possession of a firearm and ammunition, even within "ready reach" in his truck, was not unduly prejudicial, if at all. We, therefore, conclude that the trial court did not abuse its discretion in admitting the evidence.

## II. Sufficiency of the Evidence

The Defendant contends there was insufficient evidence to sustain his conviction for possession of marijuana because the State presented no proof as to the dry weight THC content of the substance found in his truck. In support, he points out that the statutory

definition of marijuana specifically excludes hemp, defined in relevant part as "cannabis . . . with a [THC] concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis[,]" Tenn. Code Ann. §§ 39-170-402 (16)(C), 43-27-101(3), and cites TBI Agent DePew's testimony that she conducted only presumptive testing of the substance. The State disagrees that it was required to offer evidence on the specific dry weight THC content of the marijuana to sustain the conviction, noting that this court recently held in *State v. Jones*, No. W2024-00027-CCA-R3-CD, 2025 WL 502064, at *5 (Tenn. Crim. App. Feb. 14, 2025), *perm. app. denied* (Tenn. June 20, 2025), that similar evidence to that offered in the case at bar was sufficient to establish a substance's identity as marijuana. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

In *Jones*, this court rejected a defendant's identical argument that the State was required to provide proof of the percentage of THC concentration in a substance to establish that the substance was illegal marijuana rather than hemp, writing:

- 7 -

Though the defendant correctly notes that the State failed to produce a lab report showing that the seized substance had a THC concentration of more than 0.3%, the State did present the testimony of Agent DePew and the results of a presumptive lab test identifying the substance as marijuana. Furthermore, the State is not required to test the alleged substance for the defendant to be convicted of a drug offense. *See State v. Schutt*, No. M2022-00905-CCA-R3-CD, 2023 WL 6120739, at *7 (Tenn. Crim. App. Sept. 19, 2023) ("[C]hemical analysis is not a prerequisite to establish the identity of a controlled substance, and the essential elements of a drug related offense may be established circumstantially."), *no perm. app. filed*.

*Jones*, 2025 WL 502064, at *5.

In his reply brief, the Defendant argues that his case is "highly distinguishable" from *Jones*, where, in addition to testimony by Agent DePew about her presumptive testing of the substance, substantial circumstantial evidence supported its identification as marijuana, including the defendant's having been found parked in a turn lane asleep, the odor of marijuana emanating from his vehicle, the defendant's admission that he had smoked marijuana, and the 19 unused baggies and digital scale found with the marijuana. *Id.* at *1-2. The Defendant asserts that in his case, by contrast, "the only evidence before the jury about whether the substance found in [his] truck was marijuana was Agent DePew's testimony."

We respectfully disagree. In addition to Agent DePew's testimony about her presumptive identification of the substance and of her having never personally experienced any conflicting results of presumptive testing, the jury heard the testimony of the officers about the "homemade" plastic bag in which the substance was packaged and the Defendant's appearing to be under the influence of some kind of intoxicant. The jury was also able to see the photograph of the substance as it was found in the truck, the "homemade" plastic bag, and to view the dash and body camera video recordings of the Defendant. Viewed in the light most favorable to the State, there was sufficient evidence from which the jury could find that the substance in the Defendant's possession was marijuana.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE

- 8 -